Filed 2/25/25  P. v. Johnson CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br>v.<br><br>DONOVAN E. JOHNSON,<br><br>        Defendant and Appellant. | A167687<br><br>(Alameda County<br>Super. Ct. No. 19-CR-001053) |

Defendant Donovan Johnson was charged with murder and assault with a semiautomatic firearm after he fired several shots down an Oakland street, killing one man and injuring another.  Surveillance footage showed 18-year-old Johnson and two friends, Abraham M. and Jabron H., walking down the street minutes before the shooting, and other, less-clear footage captured the shooting itself.  Johnson's defense at trial was that he was not the shooter, based on evidence implicating Abraham M., but the jury rejected this scenario and convicted Johnson of second degree murder and the assault charge.  The trial court sentenced him to 15 years to life plus 10 years in prison.

On appeal, Johnson claims the trial court erred by admitting the lead detective's testimony about Abraham M.'s and Jabron H.'s interrogations for the nonhearsay purpose of explaining the course of the investigation.  Johnson also claims the court improperly imposed a $10,000 restitution fine

1

without finding he had the ability to pay it. Finally, he challenges the court's ruling on his request under *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*) for the lead detective's personnel records.

We hold that even if the challenged evidence, which included the lead detective's testimony that Abraham M. identified Johnson as the shooter, was improperly admitted, the error was harmless under any standard. We also conclude that Johnson forfeited his challenge to the restitution fine by failing to object below. Finally, we conclude that the trial court did not make an adequate record of the documents it considered in deciding the *Pitchess* motion, and we therefore conditionally reverse the judgment and remand for the limited purpose of holding a new *Pitchess* hearing.

I.
FACTUAL AND PROCEDURAL
BACKGROUND

*A.    The Shooting*

The shooting occurred early on the morning of August 11, 2018, on International Boulevard in Oakland. The relevant stretch of International runs between High Street toward the west and 46th Avenue toward the east. A total of 10 rounds were fired, some of which hit the surviving victim, Leandro C., near the intersection of International and 46th. Another shot killed Chrystian Negrete Valdez (Valdez), who was hit while standing in front of La Frontera, a nightclub at the southwestern corner of International and 45th Avenue. The evidence tended to suggest that the shooter was aiming at Leandro C. and did not intend to shoot Valdez.

1.    Eyewitness testimony

Leandro C. testified that around 1:40 a.m., he was waiting for the bus on the southern sidewalk of International, near its intersection with 46th and

2

Bancroft Way.[1]  He noticed three "dark skinned" men approaching from the west on the opposite sidewalk.  The men stopped across from him, near the northwest corner of International and 46th.

About 10 minutes later, "a Latino person" approached from the east on International's northern sidewalk.  The man started crossing International diagonally, toward the corner where Leandro C. was standing.  One of the group of three men started to cross toward the same corner, with the other two following.  The Latino man, who did not interact with the group, then ran back the way he had come.

This worried Leandro C., who walked several steps west on International's southern sidewalk and hid in a building doorway.  He watched the group of three, who were now standing by the bus stop and talking to each other.  After about 15 minutes, the group walked east on International, toward a funeral home on the other side of 46th from the bus stop.

Leandro C. testified that when he saw the three men walking away, he stepped out of the building doorway toward the bus stop.  He then saw two of the three men run across International toward Taqueria El Paisa, at the northeast corner of that street and Bancroft Way, and the third person walking behind them.  The third man pointed his arm straight outward, and Leandro C. heard gunshots and felt his leg get hot.

The third man began running, following the other two, and Leandro C. "screamed at him."  Leandro C. then ran back toward the apartment building.  He was subsequently unable to identify anyone in the group of

---

[1] At this intersection, 46th runs perpendicularly north from International and Bancroft Way runs diagonally northeast from International.

three, and he told the police that all three men appeared to be the same height as each other.

Around 2:00 a.m., Manuel Espinoza, an eyewitness, was parked in his SUV on the northern side of International, between 44th and 45th Avenues.[2] He was across the street and a few doors west of La Frontera. The club had just closed, and there were several people on the sidewalk in front of it. Espinoza, who was eating, was in the front passenger's seat of his vehicle and had the door open so he could see "both ways" on International.

Espinoza testified that as he was looking west down International, toward High, he saw four young Black men approaching on his side of the street. Two were "tall," and two were "short."[3] Espinoza had seen the men "towards Seminary [Avenue] before" but not in this particular area, where he spent a lot of time. Espinoza later identified Johnson to the police as "look[ing] like one of the persons that was out there," and at the preliminary hearing he identified Johnson as "[o]ne of the taller ones" in the group.

As the four men walked by Espinoza, he noticed that one of the taller two, whom he later identified as Abraham M., "was clutching or holding something in [his] waistband as [he] walked by." The men walked past Espinoza and crossed to the opposite side of International, between 46th and 47th Avenues.

Espinoza testified that the group then approached "a young [Hispanic] man" who was at the corner of International and 45th. Espinoza saw "a

_____

[2] Espinoza testified at the August 2019 preliminary hearing but died before trial, which began in late 2022. His preliminary-hearing examination was read for the jury.

[3] Johnson was about six feet, four inches tall, Abraham M. was about five feet, ten inches tall, and Jabron H. was the shortest of the three. In light of the surveillance footage discussed below, Espinoza was apparently mistaken about there being a fourth man in the group.

4

scuffle" between the group and the Hispanic man, by the funeral home on the southern side of International. One of the Black men ran across International, and another, one of the two taller men in the group, "pull[ed] out and started shooting." He then saw three of the group, "two tall"—one of whom was Johnson—"and one short," running up Bancroft Way.

At the preliminary hearing, Espinoza testified that he could not identify the shooter, whose face he did not see. But when the police interviewed him a few months after the crimes, Espinoza identified Abraham M. as the shooter from a photographic spread.

### 2. Physical evidence

Around 2:15 a.m., a police officer taking a crime report at High and International heard about 9 to 10 gunshots nearby. As he and his partner drove east on International toward 45th to investigate, two women flagged them down. The officers stopped and discovered Valdez "motionless, lying on his back" outside La Frontera.

Valdez still had a pulse but was pronounced dead before he could be transported to the hospital. An autopsy showed that he died from a single bullet wound to the chest, with a .40-caliber bullet passing through his heart and lodging in his lung. The parties stipulated that "[t]he direction of the wound [was] front to back, minimally from left to right, and it pass[ed] neither up nor down."

As the police officer was rendering aid to Valdez outside La Frontera, Leandro C. approached from the east, "noticeably limping or having trouble walking." He had been shot in the ribcage, left arm, and ankle. Leandro C. was hospitalized for two days, and at the time of trial he could not "walk for long or run" because of his ankle injury.

5

Ten .40-caliber bullet casings were found around the intersection of International and 46th, nine in the street on the southern side of International and one on a raised median slightly farther south.  A police officer testified that the casings likely came from a semiautomatic pistol, and 10 rounds is the magazine size of most legal handguns.  The officer also testified that casings can be ejected quite far, and there was no way to tell exactly where the shooter was when firing.

3. Surveillance footage

Surveillance footage from two primary locations was played for the jury and admitted, and we have carefully reviewed it.  The first set of videos is from four cameras at 4300 International, which is on the northern side of International between High and 44th.  The footage is in color and quite clear.  The second set of videos is from a camera at Taqueria El Paisa, facing south toward International and the funeral home.  The footage is black-and-white and less clear.  Neither set of videos has sound.

At 2:06 a.m., less than 10 minutes before the shooting, the 4300 International footage shows three men walking east on International's northern sidewalk, away from High.  The shortest man has on dark pants and a hooded, red-and-blue colorblock sweatshirt with white writing and the United Kingdom's flag on it.  The prosecution introduced photographs of Jabron H., including one in which he is wearing what appears to be the same jacket.  Detective Phong Tran, the lead investigator, opined that this person in the footage was Jabron H.

The middle-height man is wearing blue jeans and a black hooded sweatshirt with a large red stop sign on it.  The prosecution introduced photographs of Abraham M., including one in which he is standing next to

6

Johnson and wearing what appears to be the same sweatshirt. Detective Tran opined that this person in the footage was Abraham M.

Finally, the tallest man is wearing light-colored pants and a black jacket with red patches on the front, including a Deadpool logo, and a white "91" on one sleeve. The same type of jacket was later discovered in Johnson's bedroom. Detective Tran opined that this person was Johnson.

The Taqueria El Paisa footage shows the shooting. At 2:12 a.m., three people walk east on International's southern sidewalk, cross 46th, and stop by the funeral home. A few seconds later, there are two flashes of gunfire. Two of the people start running north across International as the third stays behind, after which there are least two more flashes of gunfire. The third person then runs across International behind the other two, and all three run north on Bancroft Way.

Although all the figures are blurry, it is clear from the footage that the shooter is wearing the lightest pants of the three. The two figures who run first also appear to have designs on their clothes that are (1) consistent with the designs on the tops Abraham M. and Jabron H. are wearing in the 4300 International footage and (2) not consistent with the Deadpool jacket found at Johnson's home.

B. *The Investigative Shift in the Suspected Shooter*

Detective Tran testified that the police were initially unable to identify any suspects. But on August 31, 2018, 20 days after the shooting, Abraham M. was found injured. Although he told the police that someone had shot him, "[t]he trajectory of his injuries" indicated that he had shot himself, apparently accidentally. A .40-caliber Smith & Wesson handgun was found nearby under a traffic cone, where Abraham M. had tried to hide it. The parties stipulated that this handgun shot the 10 casings recovered on

7

International and the bullet recovered from Valdez's body. The parties also stipulated that Abraham M. was the major donor of DNA found on the gun's trigger, and biological material on the gun from other, minor donors was unsuitable for comparison.

After determining that Abraham M. was a suspect, Detective Tran interviewed Espinoza in October 2018. As mentioned, Espinoza identified Abraham M. as the shooter during this interview. Specifically, Espinoza selected Abraham M.'s photograph from a photographic lineup that did not include Johnson, whom the police did not yet know about. Espinoza said the shooter had his hair in "twisties," which was consistent with Abraham M.'s hairstyle.

Initially, Espinoza wrote next to Abraham M.'s photograph, "He's the one I saw in the group." When Detective Tran asked for further details, Espinoza said that Abraham M. was "the one that shot at mohawk guy." This apparently referred to Leandro C., who had that type of hairstyle at the time. Detective Tran testified that Espinoza also said he had seen Abraham M. before, in the Seminary area.

Abraham M. was arrested and interrogated in December 2018. He told the police he was with Johnson and Jabron H. around the time of the shooting.[4] The three were walking to Seminary from the Fruitvale BART station when they "ran into some Hispanic gentlemen" by "some apartments near . . . 45th, 46th Ave[nue]." According to Abraham M., Johnson "bump[ed] one of the guys" and then said, "I should shoot you," and Jabron H. told "the

---

[4] Abraham M. was personally served with a subpoena for trial but did not appear. As discussed in more detail below, his statements were introduced through Detective Tran's testimony and admitted for the nonhearsay purpose of "explain[ing] the officer's subsequent actions in the investigation of this case."

8

other guy, 'Come out your pockets' or 'What do you have in your pockets?' " The man to whom Jabron H. spoke then ran away "northbound."

Abraham M. stated that he "walked away a little bit" when "out of nowhere, . . . shots were fired by . . . Johnson" while the group was standing at the median in front of the funeral home. Abraham M. reported that he and Jabron H. ran away northbound, followed by Johnson.

Detective Tran testified that he believed Abraham M. because "[a] lot of his facts lined up with the evidence [the police] had and the statements of other people," including the bullet casings' location and the surveillance footage. Detective Tran thought that Abraham M.'s "information . . . sounded very true and honest," although the detective also believed that Abraham M. was "minimizing his part" to avoid "get[ting] in trouble for possibly . . . a robbery gone awry."

After interrogating and releasing Abraham M., the police arrested Jabron H. in early January 2019. Jabron H. did not testify at trial, and Detective Tran did not testify to any specific statements Jabron H. made during his interrogation. But the detective did agree with the prosecutor that after this interrogation he made "similar assessments that [he] had made with [Abraham M.]" and "eliminated [Jabron H.] as [whom he] believe[d] to be the shooter." Detective Tran testified that after interrogating Jabron H., he "drafted a warrant and went to look for Donovan Johnson."

On direct examination, Detective Tran was asked how he "reconcile[d]" Espinoza's identification of Abraham M. as the shooter with "the information [the detective] received from Abraham [M.] and Jabron [H.]." Detective Tran testified that one night he visited the "exact" place Espinoza said he was during the shooting to determine what could be observed about the shooting's

9

location, about 200 yards away.[5]  According to the detective, it was "just too dark and too far away" for him to be able to see "definitive characteristics of any person" (such as facial features).  In other words, Detective Tran implied that Espinoza could not have accurately identified the shooter from where Espinoza was located.

Johnson was arrested in mid-January 2019 at his residence on Seminary, about a mile from the shooting's location.  In addition to the Deadpool jacket, the police found "multiple" .40-caliber magazines and "live ammunition" in Johnson's bedroom, but no guns.

Johnson was interrogated for several hours after being arrested, first by Detective Tran and then by a deputy district attorney.  Video recordings of excerpts of the interrogation were played for the jury.[6]  Johnson admitted he had fired a gun "multiple times" before, but "only in the air."  Detective Tran asked whether Johnson remembered being with "two buddies" near High the previous August when "one of [Johnson's] buddies tried to rob a Mexican."  Johnson did not answer the question and asked for a break.

When the interrogation resumed, Detective Tran asked whether Johnson remembered an incident around High the previous August when he was with his friends and "one of you guys may have just fucked around with a gun and it went off."  Johnson said there was one occasion when he was with Abraham M. and Jabron H. around 46th and International, near the funeral home.  Abraham M. "shot a couple rounds" toward the ground, in the

---

[5] According to Detective Tran, Espinoza was parked on the northeast corner of International and High, between High and 44th.  But as mentioned, Espinoza testified that he was parked on International between 44th and 45th, over a block closer to the shooting's location.

[6] The jurors received transcripts of these portions of the interrogation, but only the recordings themselves are in our record.

10

direction of High.  Afterward, the three ran away up 46th.  Detective Tran informed Johnson that multiple witnesses claimed, and surveillance footage of the shooting confirmed, that the tallest person in Johnson's group was the shooter.  Johnson did not respond.

After another break, a deputy district attorney took over the questioning.  Johnson eventually admitted that he shot at the ground because he was testing out the gun.  After being told he was lying, Johnson reiterated that he was only "messing around" with the gun, and he did not intend to hit the person who was shot.  Johnson claimed Abraham M. also had a gun on the night in question, which was of a smaller caliber than Johnson's, but Johnson did not remember hearing any shots other than those he fired.  Johnson also denied talking to any bystanders before the shooting, although Jabron H. might have said something to another man about robbing him.

To demonstrate how he shot the gun, Johnson aimed his arm relatively perpendicular to his body, but he insisted that he was aiming downward and saw "sparks" from bullets hitting the ground.  Johnson claimed that when he left the scene, he did not know he had hit anyone, because he was over two blocks away from the victim.

During the interrogation, Johnson was also questioned about a 2016 incident in which he shot at another person who was on the ground.  Video footage of that incident that showed Johnson aiming downward as he fired several shots was introduced for the limited purpose of "knowledge or absence of mistake or accident."  At trial, Detective Tran agreed that if Johnson had used "that same stance with the same arm positioning" that he demonstrated during the interrogation, it was implausible that the bullet would have struck a victim standing two blocks away in the heart.

11

C.    *The Verdicts and Sentencing*

Johnson was charged with one count of murder and one count of assault with a semiautomatic firearm.[7]  As to the murder, it was alleged that he personally and intentionally discharged a firearm causing death.  As to the assault, it was alleged that he personally used a firearm and personally inflicted great bodily injury (GBI).[8]  Finally, the information alleged as aggravating factors that the crimes involved great violence, great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness; that Johnson was armed with or used a weapon during the crimes; that he engaged in violent conduct indicating a serious danger to society; and that he had prior criminal convictions or sustained delinquency petitions that were numerous or of increasing seriousness.[9]

The jury convicted Johnson of second degree murder and assault with a semiautomatic firearm and found true the accompanying sentencing-enhancement allegations.  Johnson also admitted the aggravating factors, as to the assault only, that he was armed at the time of the offense and engaged in violent conduct indicating a serious danger to society.

In March 2023, the trial court sentenced Johnson to a total term of 25 years to life in prison.  The court sentenced him to 15 years to life for the

---

[7] Johnson was charged with murder under Penal Code section 187, subdivision (a), and assault with a semiautomatic firearm under Penal Code section 245, subdivision (b).  All further statutory references are to the Penal Code unless otherwise noted.

[8] These allegations were made under section 12022.53, subdivisions (b) through (d), as to the murder, and sections 12022.5, subdivision (a) (use of firearm) and 12022.7, subdivision (a) (GBI infliction), as to the assault.

[9] The aggravating factors were alleged under section 1170, subdivision (b), and California Rules of Court, rule 4.421(a)(1) (great violence), (a)(2) (weapon use), (b)(1) (violent conduct), and (b)(2) (criminal record).

murder and exercised its discretion to strike the accompanying enhancement for personally and intentionally discharging a firearm causing death under section 12022.53, subdivision (d), instead imposing a consecutive term of 10 years for the lesser enhancement for personally using a firearm under subdivision (b) of that statute. The court sentenced him to a concurrent term of six years for the assault and concurrent terms of four years for the accompanying firearm enhancement and three years for the accompanying GBI enhancement.

## II.
### DISCUSSION

#### A.   *The Admission of Detective Tran's Testimony About Abraham M.'s and Jabron H.'s Interrogations Was Harmless.*

Johnson claims the trial court abused its discretion under state law and violated the confrontation clause by admitting Abraham M.'s statements to police implicating him as the shooter. On the same grounds, Johnson also challenges the admission of testimony about Jabron H.'s interrogation that "implicitly told the jury" Jabron H. had also implicated him as the shooter. We conclude that any error was harmless beyond a reasonable doubt.[10]

---

[10] Since we will assume Johnson is correct that the challenged evidence should have been excluded, we need not address his additional claim that—if we were to hold that the trial court properly admitted Abraham M.'s and Jabron H.'s statements implicating him—the court necessarily erred by excluding two other witnesses' police statements that implicated Abraham M. In any case, it is unclear how helpful the other witnesses' statements would have been to Johnson. While he claims these statements "circumstantially pointed to Abraham [M.]" as having a gun, Detective Tran testified that neither witness said "anything that suggested Abraham [M.] was the shooter."

1. Additional facts

Before trial, Johnson filed a brief identifying evidence "linking Abraham [M.] to the actual perpetuation of the homicide"—including Espinoza's testimony and Abraham M.'s possession of the murder weapon—and arguing that "it would be patent error to exclude said third-party culpability evidence." In response, the prosecution filed a motion in limine to exclude evidence of third-party culpability on the basis that "other evidence excludes [Abraham M.] as the perpetrator." Among other things, the motion pointed to the fact that Abraham M. and Jabron H. "both implicate[d] [Johnson] in their [police] interviews."

Before ruling on this issue, the trial court held a hearing on the defense's *Pitchess* motion concerning Detective Tran. At the hearing, Johnson's trial counsel made clear he intended not only to argue that Abraham M. was the shooter but also to call into question the police investigation. In explaining the relevance of the detective's personnel records, counsel stated:

> "[T]his is a third-party culpability defense as far as Mr. Johnson is not responsible for this homicide, but somebody else is. I'd like to show to the jury that based on this detective's investigation, Mr. Johnson . . . should not be here, but another individual should be here. And . . . so *I think [Detective Tran's] investigation has been skewed, it's been prejudiced somehow, it's biased somehow. There's no credible basis for Mr. Johnson sitting in this chair when some other individual should be.* And that's why I would be calling [Detective] Tran to the stand."[11] (Italics added.)

---

[11] At this point, Detective Tran was on the defense's witness list only. Johnson's *Pitchess* motion was partially denied after jury selection began, and the prosecution ultimately elected to call Detective Tran in its case-in-chief.

14

Johnson's trial counsel later clarified that he sought permission to present a third-party culpability defense but did not seek to admit any evidence implicating Abraham M. beyond that the prosecution already intended to present. The trial court ruled that Espinoza's testimony "[could] come in" and the defense could argue that Abraham M. was the shooter.

In her opening statement, the prosecutor addressed the notions that the police investigation was skewed and there was no basis for charging Johnson. The prosecutor recognized that Abraham M. was found with "the murder weapon 20 days later" and his DNA was on the weapon. Thus, he "naturally" became "the prime suspect in this case." But according to the prosecutor, when the police interviewed Abraham M., he "describe[d] exactly how the shooting went down without ever being shown the surveillance video. . . . And he told Detective Tran that it was Donovan Johnson . . . who shot the gun. [¶] So, instead of rushing to close the case, packing up his file, calling it a day, . . . Detective Tran said wait a second. Let me go back, talk to the witnesses again, go out to the scene again. Let me test the credibility of some of what I've heard, okay, before I rush to judgment. And so, now Detective Tran is working on two potential leads, either Abraham [M.] is the shooter or the defendant is the shooter." The prosecution then described the evidence of Johnson's guilt, including the ammunition and Deadpool jacket at his house and the statements he made during his interrogation.

The defense's opening statement focused on the evidence Abraham M. was the shooter, particularly Espinoza's identification of him as such. After describing this evidence, Johnson's trial counsel stated, "Fast forward to August . . . 2019. There is a [preliminary] hearing to determine if there is enough evidence to hold Donovan Johnson, not Abraham [M.], Donovan Johnson for trial for murder and assault. [¶] Why Donovan Johnson, you ask?

15

Because he confessed?" After questioning whether the interrogation was conducted fairly and implying that Johnson did not validly confess, counsel concluded by arguing that "Espinoza's identification of Abraham [M.] as the shooter" was "direct evidence . . . exonerat[ing] Donovan Johnson."

When Detective Tran began to testify on direct about Abraham M.'s interrogation, Johnson's trial counsel objected and requested a sidebar. Back on the record, counsel explained that "having testimony that [Abraham M.] identified Donovan Johnson as the shooter [was] clearly hearsay." Counsel also objected that the evidence was unduly prejudicial under Evidence Code section 352.

The prosecutor responded that she did not intend to play the recording of Abraham M.'s interrogation, and his statements were being offered not for their truth but to explain Detective Tran's investigation. She claimed that by "argu[ing] to the jury in opening that Abraham [M.] is the actual shooter in this case," Johnson raised a third-party culpability defense and put the investigation at issue. She argued that the interrogation of Abraham M. was "a turning point" in the investigation, so Detective Tran's "testimony to explain the effect on [him] and how his investigation shifted [toward Johnson] becomes extremely relevant and . . . not unduly prejudicial."

The trial court ruled that Detective Tran's testimony about Abraham M.'s interrogation could be introduced "to explain the officer's subsequent actions . . . with regard to his investigation." The court found this "appropriate based on [its] allowing the third-party culpability testimony to come in. And that's basically been stated in the [defense's] opening statement[]."

At the prosecution's request, the trial court gave the following limiting instruction before Detective Tran continued testifying: "[T]he testimony that

16

will be provided in this portion of the trial has a limited purpose. There is going to be discussion with regard to statements that were made by Abraham [M.]. [Defense counsel] made a hearsay objection to that because those are out-of-court statements, if offered to prove the truth of those statements. [Abraham M.'s] statements, however, are not being offered for the truth, . . . but rather, to explain the officer's subsequent actions in this investigation." Detective Tran then testified about Abraham M.'s interrogation as set forth above.

Later, Detective Tran testified about Jabron H.'s interrogation. Johnson's trial counsel again objected and asked for a sidebar, which was not reported. Back on the record, the prosecutor did not elicit testimony about any specific statements by Jabron H. Instead, as indicated above, Detective Tran testified that after interviewing Jabron H., he eliminated Jabron H. as a suspect for being the shooter.

The sidebar discussion was later memorialized for the record. Defense counsel explained that he objected that the testimony, which "was being offered again for the limited purpose of showing [Detective Tran's] subsequent action, . . . was too prejudicial and it was more than required to explain . . . [his] change of direction with regard to this investigation." The prosecutor responded that the issue was moot, because she "did not go into the discussions that [the detective] had with Jabron [H.]." The court agreed, and defense counsel did not object further.

In closing argument, the prosecutor emphasized that some of the evidence was admitted only for "a limited purpose. For example, the statements made by Abraham [M.] to Detective Tran. You're not going to hear me rely on any of those statements . . . because those statements were offered for the limited purpose of explaining Detective Tran's investigation."

17

Accordingly, the prosecutor did not cite Abraham M.'s or Jabron H.'s interrogations as evidence of Johnson's guilt.

In response, defense counsel suggested to the jurors that despite being told Abraham M.'s identification of Johnson was admitted for a limited purpose, they would not be able "to ignore" the identification's import or "somehow compartmentalize that in your brain and put that aside." Implying Johnson was being denied "a fair trial," counsel continued, "[Y]ou know what's going on. This is a way of getting in Abraham [M.'s] accusation against Donovan Johnson without putting him on the stand, without putting him under oath, without subjecting him to cross-examination." When giving the final instructions, the trial court did not specifically refer to Detective Tran's testimony but reminded the jury that "certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other."

### 2. General legal standards

"Hearsay is 'evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated' " and "is inadmissible unless it falls under an exception." (*People v. Ng* (2022) 13 Cal.5th 448, 539, quoting Evid. Code, § 1200, subd. (a).) "Evidence of an out-of-court statement is also admissible if offered for a nonhearsay purpose—that is, for something other than the truth of the matter asserted—and the nonhearsay purpose is relevant to an issue in dispute." (*People v. Davis* (2005) 36 Cal.4th 510, 535–536; *People v. Lucero* (1998) 64 Cal.App.4th 1107, 1109–1110.) Even if a statement is relevant for a nonhearsay purpose, it may be excluded under Evidence Code section 352 " 'when its probative value is substantially outweighed by concerns of undue prejudice, confusion, or consumption of time. "Evidence is substantially more

18

prejudicial than probative [citation] if, broadly stated, it poses an intolerable 'risk to the fairness of the proceedings or the reliability of the outcome.' " ' " (*People v. Mataele* (2022) 13 Cal.5th 372, 413.)

Under the federal confrontation clause, a criminal defendant has the right "to be confronted with the witnesses against him." (U.S. Const., 6th Amend.; *People v. Hopson* (2017) 3 Cal.5th 424, 431 (*Hopson*).) The confrontation clause "bars 'admission of testimonial statements of a witness who did not appear at trial unless [the witness] was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.' " (*Hopson*, at p. 431, quoting *Crawford v. Washington* (2004) 541 U.S. 36, 53–54.) "[T]his rule of exclusion applies only to testimonial *hearsay*" (*Hopson*, at p. 432), and the "confrontation clause is not implicated where an out-of-court statement is received for a nonhearsay purpose." (*People v. Peyton* (2014) 229 Cal.App.4th 1063, 1077; *People v. Sanchez* (2016) 63 Cal.4th 665, 674.)

3.     Analysis

Johnson claims that the purported nonhearsay purpose for introducing Detective Tran's testimony about Abraham M.'s and Jabron H.'s interrogations, to show why the police investigation changed in focus, was irrelevant. Although Johnson recognizes that "course of the investigation" evidence can qualify as relevant nonhearsay when "law enforcement decision[]making on who to investigate and who not to" is called into question, he argues that the defense never put at issue the shift from Abraham M. to him as the primary suspect. Thus, Johnson claims, the challenged evidence implicating him as the shooter was inadmissible hearsay under both state law and the confrontation clause or, at best, "highly prejudicial" nonhearsay "of minimal relevance" the trial court should have excluded under Evidence Code section 352.

19

Initially, the Attorney General argues that Johnson forfeited his claim as to all of Abraham M.'s statements except the identification of Johnson as the shooter. It is true that when Johnson's trial counsel objected to Detective Tran's testimony, he focused on Abraham M.'s claim that Johnson was the shooter. But in responding, the prosecutor stated that she intended to "ask [Detective] Tran to summarize what was said to him" in the interrogation, and the trial court broadly ruled that the detective could "testify about his discussions with Abraham [M.]" for the purpose of explaining the subsequent investigation. In our view, the record demonstrates that the parties and court understood the ruling to extend to all of Abraham M.'s out-of-court statements to which Detective Tran testified, not just the identification of Johnson. Thus, we conclude that Johnson preserved the claim as to all of those statements.

The Attorney General also contends that Johnson forfeited his claim under the confrontation clause as to both Abraham M.'s and Jabron H.'s statements by failing to object on that basis. But as Johnson points out, the trial court granted his motion in limine that his objections be deemed made under the state and federal Constitutions, and particularly "that relevance and hearsay objections be deemed . . . made based on the Fifth (Due Process), Sixth (Confrontation)[,] and Fourteenth Amendments to the United States Constitution, and on article 1, sections 7, 15, and 16 of the California Constitution." Thus, the objection on hearsay grounds to evidence of the other men's interrogations also constituted an objection under the confrontation clause. Moreover, since the court admitted Detective Tran's testimony about Abraham M.'s statements on the basis it was nonhearsay,

any further objection under the confrontation clause would have been futile.[12] (See *People v. Sanchez, supra,* 63 Cal.4th at p. 674.) In short, we will consider on the merits Johnson's full claims as to both interrogations.[13]

As the parties agree, out-of-court statements may be admissible for the nonhearsay purpose of explaining the course of a police investigation if some aspect of that investigation is called into question. (See, e.g., *United States v. Maher* (1st Cir. 2006) 454 F.3d 13, 22; *United States v. Silva* (7th Cir. 2004) 380 F.3d 1018, 1020; *People v. Peyton, supra,* 229 Cal.App.4th at p. 1077; *People v. Lucero, supra,* 64 Cal.App.4th at pp. 1109–1110.) Courts have cautioned, however, that the "course of the investigation" justification is not so broad that it allows law enforcement officers to testify about any out-of-court statement that might provide " 'background' " or "context" for an investigation. (*Jones v. Basinger* (7th Cir. 2011) 635 F.3d 1030, 1046; *Maher,* at p. 22; *Silva,* at p. 1020.) Otherwise, the justification would "eviscerate the constitutional right to confront and cross-examine one's accusers." (*Silva,* at p. 1020.)

Here, there is no dispute that the out-of-court statements were testimonial and Johnson had no opportunity for cross-examination, meaning that if they were introduced for the truth of the matter asserted their admission violated the confrontation clause. But the parties vigorously

---

[12] The Attorney General also argues that since Detective Tran did not describe any specific statements by Jabron H., the hearsay objection Johnson did make to this testimony was moot. In assuming that error occurred, we will also assume that " 'the nature of [Jabron H.'s] statements . . . [could be] readily inferred' " from the detective's testimony such that those statements were effectively introduced into evidence. (*United States v. Kizzee* (5th Cir. 2017) 877 F.3d 650, 657.)

[13] As a result, we need not address Johnson's alternative claim that his trial counsel rendered ineffective assistance by failing to object under the confrontation clause.

disagree about whether, as the trial court effectively found, the defense put the police investigation at issue such that the challenged evidence became relevant for the nonhearsay purpose of explaining that investigation.

Ultimately, we need not resolve this issue. Even assuming that Detective Tran's testimony about the statements Abraham M. and Jabron H. made during their interrogations violated the confrontation clause, the error was harmless because, as we shall explain, it is " ' "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." ' " (*In re Lopez* (2023) 14 Cal.5th 562, 581; *People v. Livingston* (2012) 53 Cal.4th 1145, 1159; see *Chapman v. California* (1967) 386 U.S. 18, 24.)

We recognize that the challenged evidence, particularly Abraham M.'s statement that Johnson was the shooter, was detrimental to the defense. And we recognize that even when out-of-court statements implicating a defendant are admitted for a valid nonhearsay purpose, they risk being misused by the jury as substantive evidence of guilt. (See *Jones v. Basinger*, *supra*, 635 F.3d at p. 1046; *United States v. Maher*, *supra*, 454 F.3d at p. 22; *United States v. Silva, supra*, 380 F.3d at p. 1020.) Here, this risk was compounded by Detective Tran's testimony that he believed Abraham M.'s story. We therefore do not believe that harmlessness is established just because the jury was instructed on the limited use of the out-of-court statements and the prosecutor affirmed that point in her closing argument. (See *People v. Fritz* (2007) 153 Cal.App.4th 949, 962 ["while we do presume the jury has endeavored to follow the court's instructions [citation], we cannot always assume that those instructions are sufficient to dispel the taint of prejudicial information"].)

Still, we have no trouble concluding that a rational jury would have found Johnson guilty even if the challenged evidence had been excluded. To

begin with, the surveillance footage decisively established that Johnson was the shooter. The initial footage of Johnson, Abraham M., and Jabron H. walking together clearly shows their relative heights and their distinctive clothing. The footage of the shooting itself is of poorer quality, but it indisputably shows that the shooter was the third person to run away, the third person was wearing the lightest-colored pants, and the first two people were wearing tops with patterns that matched the clothes worn by Abraham M. and Jabron H., not Johnson.

Johnson barely addresses this evidence, claiming merely that "the video of the shooting was not conclusive as to who the shooter was." But he does not describe what the footage shows or otherwise provide his reasoning. The respondent's brief extensively discusses why the footage definitively shows that Johnson was the shooter, but the reply brief responds only by quoting defense counsel's arguments in the trial court for why the footage of the shooting should be discounted. We might find Johnson's position more persuasive had there been no footage of the three men walking right before the shooting. But no rational juror who reviewed the footage as a whole could reasonably doubt that Johnson was the shooter.

Moreover, during his interrogation Johnson effectively admitted to shooting a gun at the same location around the same time period. He claims that this evidence should also be discounted, since it was unclear what exactly he confessed to and the interrogation was conducted under circumstances heightening the risk of a false confession. We would be more sympathetic to his position if his interrogation statements were the primary evidence of his culpability. But his story about firing a gun on International Boulevard—including his statements about being with Abraham M. and Jabron H., standing near the funeral home when he shot, and shooting in the

direction of High Street—lined up with the surveillance footage from the night of the shooting.  Thus, Johnson's interrogation statements further confirmed the visual evidence that he was the shooter.  In short, the record as a whole establishes that the admission of Detective Tran's testimony about Abraham M.'s and Jabron H.'s interrogations was harmless beyond a reasonable doubt, and reversal for evidentiary error is not required.

> B.      *Johnson Forfeited His Inability-to-pay Challenge to the Restitution Fine.*

Johnson also claims the $10,000 restitution fine imposed under section 1202.4, subdivision (b), "was far too high . . . absent any showing that [he] would have the ability to pay it."  He therefore asks us "to reduce the restitution fine to the minimum $300, or remand for an ability to pay hearing."  He forfeited this claim by failing to object below.

The trial court imposed a $10,000 restitution fine without explicitly addressing Johnson's ability to pay the charge.  Johnson did not contemporaneously object.  Nonetheless, he claims he is entitled to relief because by failing to find he had the ability to pay the fine, the court violated his due process rights under *People v. Dueñas* (2019) 30 Cal.App.5th 1157, 1164 (*Dueñas*), and the Eighth Amendment's prohibition of excessive fines under *People v. Cowan* (2020) 47 Cal.App.5th 32, 45–49 (*Cowan*) (review granted Jun. 17, 2020, S261952).

"In general, a defendant who fails to object to the imposition of fines and fees at sentencing forfeits the right to challenge those fines and fees on appeal."  (*People v. Ramirez* (2023) 98 Cal.App.5th 175, 224.)  Both *Dueñas* and *Cowan* were decided well before Johnson was sentenced in 2023, and there was thus no obstacle to his objecting on ability-to-pay grounds.  (See *Ramirez*, at pp. 224–225 [noting numerous decisions applying forfeiture rule where defendant sentenced post-*Dueñas*].)  Moreover, section 1202.4,

24

subdivision (d), provides that the sentencing "court shall consider any relevant factors, including, but not limited to, the defendant's inability to pay" when "setting the amount of the fine pursuant to subdivision (b) in excess of the minimum fine" of $300. (§ 1202.4, subds. (b)(1), (d).) Thus, " 'even before *Dueñas* [or *Cowan*] a defendant had every incentive to object to imposition of a maximum restitution fine based on inability to pay because governing law as reflected in the statute [citation] expressly permitted such a challenge.' " (*Ramirez*, at p. 225.)

Johnson does not offer any good reason why we should consider this claim despite his clear forfeiture of it. He states his trial counsel "might have avoided objecting because the trial court gave [him] a prison term reduction and [counsel] didn't want to 'rock the boat,' " but this is speculative and an insufficient excuse for failing to raise the issue in the trial court. Thus, we decline to disturb the $10,000 fine or require the court to hold an ability-to-pay hearing.

### C. *Remand Is Required for a New* Pitchess *Hearing.*

Finally, at Johnson's request, we have attempted to review the trial court's partial denial of his *Pitchess* motion for disclosure of Detective Tran's personnel records. Because the trial court did not make a record of the documents it considered in ruling, we are unable to determine whether it erred. In addition, the record is silent on whether the custodian of records withheld any documents from Detective Tran's file. As a result, we must conditionally reverse the judgment and remand for a new *Pitchess* hearing.

#### 1. Additional facts

Before trial, Johnson filed a *Pitchess* motion seeking Oakland Police Department personnel records reflecting "any instance of misconduct" by Detective Tran, "including but not limited to: acts of false arrest, fabrication

25

of evidence and/or charges, dishonesty, or other instances of conduct unbecoming an officer." The motion also sought any records from the police department, its internal affairs division, or the office to which citizen complaints are made "relating to [Detective Tran] that record any complaints submitted by any inmate, fellow officer, or private citizen complaining of any [such] misconduct." In an accompanying declaration, Johnson's trial counsel averred that the prosecutor had informed him that in another case, "it was discovered that there was inconsistent testimony from Officer Phong Tran. It is recommended that a Pitchess motion be filed."[14] Counsel stated that "information regarding [the detective's] propensities for false arrest, fabrication[,] and dishonest conduct [was] needed to formulate and prove the defense in this case," including for impeachment purposes.

Over the Oakland City Attorney's objection, the trial court decided to conduct an in camera review of Detective Tran's personnel records. The City Attorney provided the court with "a thumb drive [containing] . . . the responsive documents that [were] identified by the custodian of records," a police officer from internal affairs. The officer also submitted a declaration, which is not in our record. Although that officer appeared in court, he was never sworn in, and the court did not question him about how he decided which documents to include on the thumb drive.

After an in camera review of documents going back 10 years, the trial court required the City Attorney to disclose records involving five complaints,

_____

[14] Johnson provided this court with news articles about Detective Tran, and the Attorney General has not objected to our considering them. In brief, they reflect that as a result of Detective Tran's misconduct, murder convictions of two Alameda County defendants were overturned in 2022— before the *Pitchess* motion was filed in this case. They also reflect that as of June 2023, Detective Tran was facing criminal charges, including perjury and bribing a witness, based on that misconduct.

none of which were sustained. But the court declined to order disclosure of documents related to two more recent complaints because they were "pending matters." The relevant documents were apparently disclosed to the defense under a protective order, but neither that order nor the disclosed materials are in our record.

After filing his opening brief, Johnson filed two motions in this court related to the trial court's ruling. In the first, his appellate counsel sought disclosure of the sealed reporter's transcripts of the *Pitchess* proceedings below. We denied the request, which deviated from the standard procedure of not permitting appellate counsel to view sealed *Pitchess* records. (See *People v. Hughes* (2002) 27 Cal.4th 287, 330.) But we construed the motion as a supplemental opening brief and stated that we would "review the trial court's ruling on access to [Detective] Tran's personnel records when [we] address[ed] the merits of the appeal." We also directed the trial court to provide us with the thumb drive or the records it contained, if available.

The trial court subsequently informed us that it did not possess the thumb drive. Johnson then moved this court for an order that the People and the City of Oakland produce to us the thumb drive and/or the documents it contained. We denied the request, although we also construed this motion as a supplemental opening brief. The Attorney General did not respond to either supplemental opening brief.

2.     Analysis

In *Pitchess*, our state Supreme Court held that "a criminal defendant [can] 'compel discovery' of certain relevant information in the personnel files of police officers by making 'general allegations which establish some cause for discovery' of that information and by showing how it would support a defense to the charge [or charges] against [the defendant]." (*Warrick v.*

27

*Superior Court* (2005) 35 Cal.4th 1011, 1018–1019.) This holding was later codified in sections 832.5, 832.7, and 832.8 and Evidence Code sections 1043 through 1047. (*People v. Mooc* (2001) 26 Cal.4th 1216, 1226 (*Mooc*); see *Warrick*, at p. 1019.) *Pitchess* and the resulting statutory scheme attempt to balance a criminal defendant's "due process right to a fair trial" with an officer's "strong privacy interest." (*Mooc*, at p. 1227.)

To obtain discovery of an officer's personnel records, a defendant must file a motion that includes an affidavit establishing "good cause" for the discovery, "setting forth the materiality thereof to the subject matter involved in the pending litigation and stating upon reasonable belief that the governmental agency identified has the records or information from the records." (Evid. Code, § 1043, subd. (b)(3).) Where, as here, the trial court concludes that the defendant has "made a showing of good cause, the custodian of records should bring to court all documents 'potentially relevant' to the defendant's motion." (*Mooc, supra*, 26 Cal.4th at p. 1226.) If the custodian "does not produce the entire personnel file for the court's review," the custodian must establish under oath "what documents or category of documents" were excluded and explain the decision to exclude them. (*People v. Guevara* (2007) 148 Cal.App.4th 62, 69; *Mooc*, at p. 1229 & fn. 4.) The court then conducts an in camera review of the documents and, subject to various "statutory exceptions and limitations," discloses to the defense any " 'information [that] is relevant to the subject matter involved in the pending litigation.' " (*Mooc*, at p. 1226, quoting Evid. Code, § 1045, subd. (a).)

A trial court's ruling on a *Pitchess* motion is reviewed for an abuse of discretion. (*Mooc, supra*, 26 Cal.4th at p. 1228.) *Mooc* held that to permit meaningful appellate review of a defendant's *Pitchess* claim, the trial court must make a sufficient record of the documents it reviewed in reaching its

ruling.  (*Mooc*, at p. 1228.)  "If the documents produced by the custodian are not voluminous, the court can photocopy them and place them in a confidential file.  Alternatively, the court can prepare a list of the documents it considered, or simply state for the record what documents it examined." (*Id.* at p. 1229.)  But "[w]ithout some record of the documents examined by the trial court, a party's ability to obtain appellate review of the trial court's decision, whether to disclose or not to disclose, would be nonexistent."  (*Ibid.*)

Here, despite our own efforts and those of Johnson's appellate counsel, we were unable to obtain the records the trial court reviewed when ruling on Johnson's *Pitchess* motion.  As a result, we have no way to evaluate whether the court erred in determining which records to withhold.  Moreover, our record is silent as to which, if any, documents the custodian of records did not produce for the court's review.

We therefore remand the case for the trial court " 'to hold a hearing to augment the record with the evidence [it] . . . considered in chambers when it ruled on the *Pitchess* motion.' "  (*People v. Gaines* (2009) 46 Cal.4th 172, 180– 181 (*Gaines*).)  In addition, if the custodian did not produce Detective Tran's entire file, the court must ensure the record adequately reflects the custodian's reasoning for withholding documents.  (See *People v. Guevara*, *supra*, 148 Cal.App.4th at p. 69.)

Generally, if a trial court had already reviewed all the potentially relevant documents in an officer's file and we were remanding simply for a better record to be made, the court likely would not identify any additional material to be disclosed.  In such cases, the court would then reinstate the judgment, and the defendant would have the opportunity to appeal the original *Pitchess* ruling.  (See *Gaines*, *supra*, 46 Cal.4th at p. 181 & fn. 3.)

But here, it seems likely there is more relevant information to be disclosed. Although we are unable to effectively review the trial court's ruling at this juncture, we are deeply concerned that it appears no records involving Detective Tran's alleged misconduct in another murder case, which was undoubtedly known to the Oakland Police Department before the *Pitchess* hearing in this case, were turned over to the defense. It is unclear whether the trial court was referring to the other case when it declined to disclose documents relating to "pending matters," but regardless we are unaware of any authority for withholding information about relevant complaints simply because they have not yet been resolved. (See *City of Los Angeles v. Superior Court* (2002) 29 Cal.4th 1, 13.) Should the court determine on remand that more records must be disclosed, it " 'must order disclosure, allow [Johnson] an opportunity to demonstrate prejudice, and order a new trial if there is a reasonable probability the outcome would have been different had the [additional] information been disclosed.' " (*Gaines*, *supra*, 46 Cal.4th at p. 181.)

## III.
### DISPOSITION

The judgment is conditionally reversed. The matter is remanded to the trial court with directions to hold a new *Pitchess* hearing regarding Detective Tran's records consistent with this opinion. If the court finds there are no other discoverable records, or there are more discoverable records but Johnson was not prejudiced by their nondisclosure, the judgment shall be reinstated. Otherwise, the court shall order disclosure of the additional records and conduct further proceedings as appropriate.

_____

Humes, P.J.


WE CONCUR:



_____

Banke, J.



_____

Smiley, J.




*People v. Johnson*  A167687


31